1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RODOLFO C. ANDERSON,

11              Plaintiff,                       Case No. 1:07-cv-00715 ALA (P)

12         vs.

13   DR. TALISMAN,                               <u>ORDER</u>

14              Defendant.

15   _____/

16         Plaintiff Rodolfo Anderson ("Anderson") is a California state prisoner.  He is serving a

17   sentence of over 210 years for multiple counts of assault with a machine gun, carjacking, and

18   robbery.  (Anderson Deposition 8:13-17; Doc. No. 62 ¶ 4.)  On May 15, 2007, Anderson filed an

19   *in pro per* complaint, pursuant to 42 U.S.C. §1983, against "Dr. Mark Talisman (Psychiatrist), a

20   psychiatrist at California State Prison, Corcoran (CSPC), Rn. Leblue (Registered Nurse)."  (Doc.

21   No. 1.)  Dr. Talisman filed an answer to the complaint on June 26, 2008.  Anderson filed a reply

22   to the answer to his complaint on August 1, 2008.

23         In his complaint, Anderson alleged that the Defendants administered anti-psychotic

24   medications against his will without due process in violation of the Fourteenth Amendment,

25   because he was talking loudly while exercising his First Amendment right to freedom of speech.

26         On November 13, 2008, Anderson, acting *in pro per*, filed a pleading, styled as a first

-1-

1    amended complaint, solely against Dr. Talisman.[1] (Doc. No. 27.)  Dr. Talisman filed an answer

2    to the first amended complaint on December 15, 2008.  (Doc. No. 31.)

3          On January 20, 2009, Anderson filed a reply to Dr. Talisman's answer to the first

4    amended complaint.  (Doc. No. 35.)  On January 28, 2009, Anderson filed a motion requesting

5    the appointment of counsel because he was "currently a patient in the Mental Health Delivery

6    System at the C.O.P. level of care and taking four (4) psychotropic medications and the issues

7    are too complexed for Plaintiff's comprehension."  (Doc. No. 40.)  This Court granted the

8    motion for the appointment of counsel on February 9, 2009.  (Doc. No. 41.)

9          Following discovery cutoff, Dr. Talisman filed a motion for summary judgment on June

10   15, 2009.  (Doc. No. 47.)  Anderson's counsel filed an opposition to Dr. Talisman's motion for

11   summary judgment on July 9, 2009.  (Doc. No. 59.)  Dr. Talisman filed a reply on July 15, 2009.

12   (Doc. No. 65.)

13         After reviewing the pleadings and submissions by the parties, for the reasons set forth

14   below, the Court will grant Dr. Talisman's motion for summary judgment.

15                                              **I**

16         In his first amended complaint, Anderson alleged that he was admitted to the CSP-COR

17   Acute Care Hospital ("ACH") on August 8, 2006 "due to paranoia thoughts relating to an

18   unexpected attempt to transfer complainant to another facility."  (Doc. No. 27 at 4.)

19         He also alleged that while he was talking loudly in his cell at the ACH on August 9,

20   2006, to another inmate "about how America wrongfully went to war with Iraq based upon lies,"

21   a female nurse directed him to drink the contents of a clear plastic cup.  (*Id.*)  Anderson asked

22   ────────────────────

23         [1]      On September 12, 2008, this Court ordered Anderson to show cause on or before
      October 3, 2008 why the Court should not dismiss this action against Defendant Leblue who was
24    not timely served as required by Rule 4(m) of the Federal Rules of Civil Procedure.  (Doc. No.
      22.)  Anderson failed to respond to the Court's September 12, 2008 order.  Accordingly, on
25    October 9, 2008, the Court dismissed Leblue without prejudice pursuant to Rule 4(m).  (Doc.
      No. 23.)
26

the nurse what was in the cup. (*Id.* at 5.)  He was told that it was Resperdal and had been

prescribed by a doctor. (*Id.*)  When Anderson asked to see the doctor, the nurse departed without

giving him the medication. (*Id.*)

Anderson further alleged that five minutes later, two correctional officers came to his

cell, handcuffed him, and took him to Dr. Talisman's office. (*Id.*)  Dr. Talisman informed him

that he was ordering involuntary medication three times a day for three days. (*Id.*)  Anderson

further alleged that when he inquired of Dr. Talisman why he was being subjected to a

medication against his will since he had done nothing wrong, Dr. Talisman replied, "You're

psychosis [sic], you're hearing voices." (*Id.* at 6.)  Anderson alleges he responded: "No I'm not.

I never told you that." (*Id.*)  Dr. Talisman replied: "Oh well.  That's what I've ordered.  Get him

out of here!" (*Id.*)  Anderson alleged that after he was returned to his cell, a nurse administered

"psychotropic medication into his veins" while he was still handcuffed. (*Id.*)

Anderson alleged that on August 30, 2006, he was again admitted to ACH "due to

paranoia thoughts relating to another attempt to transfer complainant to another facility that

complainant was afraid to go to." (*Id.*)  Two hours after being admitted, he saw another inmate

forcibly medicated. (*Id.* at 7.)  After the nurses and guards left, Anderson asked the inmate if he

was under a court order that authorized involuntary medication.  Anderson alleged that he spoke

loudly because "the cells are sealed without any openings in the door or anywhere to talk

through." (*Id.*)

Anderson alleged that Dr. Talisman approached his cell and stated: "Mr. Anderson,

somehow I knew all this noise was coming from you.  You just can't keep your mouth shut, can

you?  Well, I'm going to put you on involuntary medication for 72 hours until you learn how to

keep quiet." (*Id.*)

Anderson alleged that he replied: "Dr. Talisman, that's not right.  I am not suicidal nor a

threat to anyone else.  Can I speak to another doctor or anyone else because I feel that you're

bias [sic] towards me." (*Id.*)  Anderson alleged that Dr. Talisman replied: "I'm sorry Mr.

1   Anderson you cannot.  Maybe this time you'll learn to keep your mouth shut."  (*Id.* at 8.)

2   Anderson further alleges that after Dr. Talisman left, he was handcuffed by two correctional

3   officers and a male nurse administered a high dosage of Geodon, a psychotropic medication.

4   (*Id.*)

5           Anderson alleged in his first amended complaint that the failure to advise him of the

6   possible side affects of the drugs before they were administered against his will, the denial of an

7   administrative hearing, and the denial of an opportunity to speak to an unbiased physician

8   demonstrates "gross negligence, deliberate indifference and reckless disregard for complainant's

9   well being, were undue retaliatory measures exercised under the color of authority, not to

10  advance a legitimate medical or correctional goal (because complainant was not a harm or threat

11  to himself or anyone else,) but to punish him solely for exercising his First Amendment right to

12  free speech."  (*Id.* at 11.)

13          Anderson prayed for injunctive relief, and compensatory, as well as punitive damages.

14                                              **II**

15                                              **A**

16          Dr. Talisman contends that his motion for summary judgment should be granted because

17  there is no genuine issue of material fact regarding whether he violated due process by injecting

18  Anderson with a medication against his will on three separate dates as immediately necessary for

19  the preservation of Anderson's life and the prevention of serious bodily injury to himself or

20  others due to a sudden change in his mental condition.  Dr. Talisman also asserts that he did not

21  retaliate against Anderson because he exercised his First Amendment right to the freedom of

22  speech.

23                                              **B**

24          In his response to Dr. Talisman's motion for summary judgment, Anderson argues that

25  the motion should be denied because there are genuine issues of material fact in dispute

26  regarding whether he "posed an imminent threat of harm to himself or to others justifying

Defendant's orders to involuntarily medicate him on August 9, 2006 and on August 30, 2006,"

(Doc. No. 59 at 5) and whether Dr. Talisman ordered an involuntary injection of Geodon so that

"next time you will learn to keep your mouth shut."  (*Id.* at 9.)

### III

A district court may grant a motion for summary judgment when "there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under this standard, "the

substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A material fact is genuine for the purpose of summary judgment "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).

The movant may satisfy this burden by either "submit[ting] affirmative evidence that

negates an essential element of the nonmoving party's claim" or "demonstrat[ing] to the Court

that the nonmoving party's evidence is insufficient to establish an essential element of the

nonmoving party's claim."  *Id.* at 331.  "Either way, however, the moving party must

affirmatively demonstrate that there is no evidence in the record to support a judgment for the

nonmoving party."  *Id.* at 332.  The material lodged by the moving party "must be reviewed in

the light most favorable to the opposing party." *Adickes*, 398 U.S. at 457.  "The evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty

Lobby*, 477 U.S. at 255.

> [I]n ruling on a motion for summary judgment, the judge must
> view the evidence presented through the prism of the substantive
> evidentiary burden.  This conclusion is mandated by the nature of

-5-

this determination.  The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.  Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id.* at 254-55.  If the moving party carries its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In his opposition to Dr. Talisman's motion for summary judgment, Anderson's sole contention is that "[t]here are triable issues of fact as to whether Mr. Anderson posed an imminent threat of harm to himself and others justifying Defendant's orders to involuntarily medicate him on August 9, 2006 and on August 30, 2006."  (Doc. No. 59 at 1.)  This argument is directed at Anderson's claim that his Fourteenth Amendment right to due process was violated. The opposition fails to address the First Amendment claim set forth in Anderson's first amended complaint.  In his reply to Anderson's opposition to the motion for a summary judgment, Dr. Talisman argues that "this Court should consider the . . . First Amendment issues conceded by Anderson." (Doc. No. 65 at 2.)

It is the law of the Ninth Circuit that a federal constitutional claim that is not referred to in an opposition to a motion for summary judgment "must be dismissed."  *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008).  Therefore, the claim that Dr. Talisman ordered that Anderson be injected with a psychotropic medication against his will in violation of, or in retaliation for, his right to freedom of speech must be dismissed.

Accordingly, this Court must consider the evidence presented by the parties in the light most favorable to Anderson to determine whether Anderson's substantive or procedural Fourteenth Amendment rights were violated by Dr. Talisman.

1

**IV**

2

**A**

3        In *Washington v. Harper*, 494 U.S. 210 (1990), the Supreme Court instructed that a state

4   prisoner "possesses a significant liberty interest in avoiding the unwanted administration of

5   antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id*. at 221.  In

6   a subsequent passage, the Supreme Court held that "given the requirements of the prison

7   environment, the Due Process Clause permits the State to treat a prison inmate who has a serious

8   mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or

9   others and the treatment is in the inmate's medical interest." *Id*. at 227.  The Court held that

10  Harper's substantive Due Process rights were met because the "proper use of [antipsychotic]

11  drugs is one of the most effective means of treating and controlling a mental illness that is likely

12  to cause violent behavior. *Id.* at 226.  The inmate in *Harper* "was involuntarily medicated for

13  about one year." *Id* at 217.

14       The Court also rejected Harper's claim that his procedural due process rights were

15  violated because a judicial hearing was not conducted as a prerequisite for his involuntary

16  treatment.  *Id*. at 228.  The Court concluded that the procedure adopted by the state of

17  Washington that required that an administrative hearing be held to determine whether the

18  decision made by a medical professional to administer an antipsychotic medication if an inmate

19  suffers a mental disorder and is "dangerous to himself, others, or their property" satisfied

20  procedural due process protections.  *Id*. at 232-233.

21       In his opposition, citing *Kulas v. Valdez*, 159 F.3d 453 (9th Cir. 1998), Anderson

22  concedes that under the law of this Circuit, the due process procedural requirements described in

23  *Harper* are not applicable when an emergency exists requiring the involuntary administration of

24  an antipsychotic medication.  (Doc. No. 59 at 12.)

25       In *Kulas*, citing *Hogan v. Carter*, 85 F.3d 1113 (4th Cir. 1996), the Ninth Circuit noted

26  that "[t]here is no evidence that Kulas posed such an imminent and serious danger to himself or

others that the minimal procedural requirements of *Harper* - notice and right to be present at and participate in a hearing - could not be met." 159 F.3d at 456.

In *Hogan*, a doctor "personally familiar with Hogan, his mental disorder, and his prior treatment, determined, pursuant to and consistent with accepted professional judgment, that it was in Hogan's medical interest to receive the one-time dose of Thorazine in order to protect Hogan from imminent, self-inflicted harm." *Id*. at 1117 (citation omitted).  The Fourth Circuit reversed the district court's decision denying the doctor's motion to dismiss and remanded the matter with instructions to enter judgment for the doctor.  *Id.* at 1118.  The Fourth Circuit commented:

> If Dr. Carter had not ordered the single dose of Thorazine that he did order, and instead delayed emergency medical intervention until after Hogan had been afforded the predeprivation hearing to which the district court held Hogan was entitled, it is not unlikely that Dr. Carter would now be facing a lawsuit by Hogan claiming that he was deliberately indifferent to his serious medical needs. That Dr. Carter should not be liable for taking the very action, the failure of which to take could have exposed him to such a lawsuit, should come as no surprise.

*Id*. at 1118-19.

In *Kulas*, the Ninth Circuit noted that the inmate-patient was "merely loud and uncooperative."  159 F.3d at 456.  Here, as summarized below, the undisputed evidence shows that Anderson had refused his medication, after being admitted to a crisis unit as the result of a serious medical condition that caused him to experience paranoia, hallucinations, as well as suicidal and homicidal ideations.

**B**

It is undisputed that during the relevant time periods, Dr. Talisman was employed by the State of California Department of Corrections and Rehabilitation ("CDCR").  (Doc. No. 62 ¶ 1.) He earned his medical degree at the UCLA Medical School in 1970.  (*Id.* ¶ 2.)  He has practiced medicine continually since 1975.  (*Id.*)  He is certified by the American Board of Medical Specialists as a specialist in the area of psychiatry and neurology.  (*Id.*)  He has been a staff

psychiatrist at CSPC since 1995, and has worked in the Mental Health Crisis Bed unit

("MHCB") for over ten years, starting in 1996.  (*Id.* ¶ 1.)  The MHCB unit provides treatment

for prison inmates who suffer from acute mental health conditions requiring twenty-four hour

nursing care.  (*Id.* ¶ 3.)  The MHCB unit has twenty-four beds in separate cells.  (*Id.*)

## C

In his June 11, 2009 declaration, Dr. Talisman declared as follows:

> 5.     I have treated hundreds of inmate-patients since August 9, 2006, and have no recollection of Anderson or the incident.  In making this declaration, I have examined Anderson's Unified Heath Record (UHR) which includes my physician's notes and orders.  An inmate's UHR contains all of the inmate's physical and mental health history since incarceration, including inpatient stays in MHCB. Charts are the current inpatient medical record and usually contain admitting record admission assessments and notes, physician's orders and notes, nursing care records, mental health treatment plan, discharge summary, inpatient medication records and other documents. The charts are kept in the inmate's UHR.

> 6.     In making this declaration, I have also examined portions of Anderson's Central File (C-file), which includes his custody history, his sentence, Rules Violations Reports (RVRs) and custody reviews, among other things.

> 7.     In treating Anderson in August 2006, I would have reviewed portions of Anderson's C-File, UHR, and chart.  My decisions in treating Anderson in August of 2006 were based on:
> *       my objective observations of Anderson's speech, behavior and demeanor;
> *       Anderson's subjective complaints and disclosures;
> *       the subjective and objective observations of health care or custody staff, either recorded in the UHR, his chart, or told to me directly;
> *       review of Anderson's physical and mental health history in the UHR;
> *       review of Anderson's chart;
> *       review of Anderson's C-file; and
> *       my experience and education.

> 8.     A review of Anderson's chart revealed the following: On August 8, 2006, Anderson came to the MHCB unit from the emergency room, escorted by two correctional officers due to "auditory hallucination and homicidal ideations."  (Def.'s Exs. 0368, 0307.)  Just a few days before, he was not having hallucinations, suicidal or homicidal ideations and was cooperative.  (Ex. A, attachment to Dr. Talisman's Deposition, Ex.

1.) The chief complaint was "suicidal ideation." (Def.'s Ex. 0307.) Anderson told the MHCB admitting nurse on August 8, 2006: "I am hearing voices and they are telling me that people are trying to get me and kill me. I am homicidal because I want to kill these people who want to kill me. I will stop eating and drinking now." (*Id.* at 0307, 0368, 0337.) On the Emergency Care Flow Sheet for August 8, 2006, Anderson is quoted: "I'm feeling homicidal. I feel like people are trying to kill me." (*Id.* at 0307.) The narrative Discharge and Transfer Summary dated August 8, 2006, states: "[u]pset at sudden transfer to SATF [causing] suicidal ideation; custody issues and paranoid trends." (*Id.* at 0308.) The admitting diagnosis was nonspecific mood disorder; the principal diagnosis was nonspecific adjustment disorder. (*Id.* at 0302.) Anderson was placed on suicide precautions. (*Id.* at 0358.)

9.     Anderson was under the care of psychologist Dr. Osborne and me, as well as two doctors, Dr. Hasadsri, and Dr. Raman, who examined him physically. (Def.'s Exs. 0327-29, 03 10-03 12.)

10.    Dr. Hasadsri's report states that Anderson claimed to be "hearing voices telling him to hurt himself" and that he had tried to commit suicide by hanging. He noted, "[Anderson] appears to be very angry and irritated." (Def.'s Ex. 0310.) Dr. Hasadsri's impression was "Suicidal ideation, psychosis not otherwise specified." (*Id.*)

11.    On August 9, 2006, Dr. Osborne noted that Anderson was hearing voices, his insight and judgment was impaired, and that he was homicidal. Dr. Osborne noted that Anderson was a "DTO" – a danger to others. (Def.'s Exs. 0327-28.)

12.    The nursing care record of August 8, 2006, states: "intervene at the earliest signs of agitation." (Def.'s Ex. 0357.) On August 9, 2006, at 8:00 a.m., "[Anderson] refused to answer any questions– took a.m. meds reluctantly– holding meds momentarily then layed [sic] down and covered his head– unable to interview. High risk or self-directed violence and possible violence to others. Also [complained of] auditory hallucinations. [Retracted] his claim on admission. Observe frequently for any suicide attempts." (*Id.* at 0355.)

13.    On August 9, 2006, at approximately 9:15 a.m., Anderson refused Risperdal (risperidone). I met with Anderson and observed: "[inmate] refuses to sit in chair, refused Risperdal for reported A/H [auditory hallucinations]. Argumentative, denied prior claims of A/H." (Def.'s Exs. 0317, 0321,0355.)

14.    A review of Anderson's UHR revealed he had been in the MHCB three times the previous month for suicidal ideations. Anderson was admitted to MHCB from July 17, 2006 to July 20, 2006. (Def.'s Exs. 0102-03, 0108.) The admitting diagnosis was

mood disorder; the principal diagnosis was adjustment disorder. (*Id.* at 0103.)  At that time, Anderson told me he was having thoughts of hanging himself.  (*Id.* at 0112.)  Anderson told Dr. Osborne "he was going to hang himself last night."  (*Id.* at 0118.) Dr. Otanez admitted Anderson as a "danger to self" and put him on suicide precautions.  (*Id.* at 0117.)  Anderson was again admitted to MHCB July 25, 2006 to July 27, 2006.  (*Id.* at 0123-24.)  The admitting and principal diagnosis was major depressive disorder. (*Id.* at 0124.)  The chief complaint was "suicidal."  (*Id.* at 0128.) Anderson was admitted as a "danger to self" and "danger to others" and put on suicide precautions.  (*Id.* at 0136.)  Anderson was next admitted to MHCB July 28, 2006 to July 31, 2006.  (*Id.* at 0081-82, 0085.)  The admitting diagnosis was depression "NOS" [not otherwise specified] with psychotic features.  (*Id.* at 0082, 0086.)  The principal diagnosis was schizoeffictive disorder with depression.  (*Id.*)  Anderson said he was hearing voices telling him to hurt himself, and was feeling suicidal.  (*Id.* at 0087.)  Dr. Juarez admitted Anderson as a "danger to self," and put him on suicide precautions.  (*Id.* at 0097.)  Dr. Juarez, prescribed 20 mg. Geodon (ziprasidone hydrochloride) as needed for agitation.  (*Id.* at 0096.)  There is no notation that Anderson suffered any adverse reaction to Geodon.  (*Id.* at 0085-86, 0096.)  Anderson was prescribed Depakote (divalproex sodium) starting on July 31, 2006 and ending October 29, 2006.  (*Id.* at 0086, 0335.)

15.    Other suicide risk factors are apparent in Anderson's UHR and C-file: 1) he is serving a life sentence (Def.'s Ex. 0331); 2) he has RVRs for masturbating in front of staff (indicating a lack of impulse control) (*Id.* at 0042, 0044-45,0146); and 3) a prior suicide attempt.  (*Id.* at 0310, 0331.)

16.    I have experience with inmates suffering from mood adjustment disorder, with auditory hallucination and suicidal ideations.  If not medicated, such inmates can be in immediate danger of self inflicted harm or suicide.  In my experience, inmates need not be screaming or yelling or be actively in the process of attempting suicide to be an immediate danger to themselves or others.  I have seen inmates, similar to Anderson in diagnosis and mental health history, go from relative calm to self-injurious behavior in a matter of minutes if not treated.

17.    I have experience with inmates who have seriously harmed themselves in MHCB without the aid of instruments, by bashing their heads on the door, window, or wall, by gouging their own eyes, ripping out their hair, or by punching their own face or body.

18.    Inmates in the MHCB unit frequently are shouting or yelling and uncooperative.  I do not order involuntary medication for inmates solely because of any of those behaviors.

19.    Based on Anderson's history leading up to August 9, 2006,

and his behavior on August 9, 2006, at 9:30 a.m., I ordered Anderson to be involuntarily medicated with 10 mg. of Zyprexa (olanzapine) by intramuscular injection three times a day for 72 hours as he was at immediate risk of self-harm as a result of a mental disorder.  (Def.'s Exs. 0317, 0321, 0332, 0355.)

20.     Anderson was given three intramuscular injections of 10 mg. of Zyprexa on August 9, 2006.  (Def.'s Exs. 0317, 0321, 0332, 0355.)  He was given only one 10 mg. injection on August 10, 2006.  (*Id.* at 0332, 0352.)  On August 10, 2006, because he had improved, I ordered Anderson be placed on voluntary medication status, and I reduced the dose to 10 mg. Zyprexa tablets, given once a day, orally at bedtime.  (*Id.* at 0317, 0312, 0322, 0332.)

21.     The maximum recommended dosage of Zyprexa given intramuscularly is 30 mg. within 24 hours.  Dosage may be adjusted depending on the person's response to the drug.  The dose also will depend on certain medical problems the person may have.  Here, there was no contraindication for that dosage.  Zyprexa is indicated for the treatment of acute agitation and certain mental/mood conditions (such as schizophrenia or bipolar mania).  It works by helping to restore the balance of certain natural chemicals in the brain (neurotransmitters).  Some of the benefits of this medication include decreased agitation, feeling less nervous, better concentration, and reduced episodes of hallucinations.  A side effect is sleepiness; however, this effect tends to diminish as the body adjusts to the medication.

22.     In my medical judgment, the medication was in the best interest of Anderson, and that due to his mental illness, the medication was immediately necessary for the preservation of life or the prevention of serious bodily harm to Anderson or others.  I did not order involuntary medication of Anderson for any other reason.

23.     Dr. Osborne concurred with involuntary medication and his treatment plan was to place Anderson on involuntary medication for 72 hours.  (Def.'s Ex. 0339.)

24.     The prescription for Zyprexa was only that which was required to treat the emergency condition and was provided in ways that are least restrictive of the personal liberty of the inmate.  In my medical judgment, other medications (such as Depakote, Risperdal, and Geodon) would not have treated Anderson's agitation and hallucinations as well as Zyprexa..  The alternative to involuntary medication in Anderson's case, given his condition and the above facts, would be five-point physical restraints, which would not be the least restrictive of the personal liberty of the inmate.

25.     Anderson responded to treatment with Zyprexa very well.

On August 9, 2006, at approximately 11:30 a.m., I saw Anderson shortly after he was involuntarily medicated and noted that he was "argumentative, litigious." (Def.'s Exs. 0317, 0322, 0355.) At 11:30 a.m., the nurse noted that Anderson "refused lunch [due to] being angry about injection." (*Id.* at 0355.) At 2:30 p.m., the nurse gave Anderson a second injection of Zyprexa, and noted that Anderson was "cooperative-asked multiple questions re meds, frequency, dose and who the psychiatrist was . . ." (*Id.*) At 5:00 p.m. Anderson was given dinner. (*Id.*) At 7:00 p.m., Anderson told the nurse "I'm Okay," and denied suicidal and homicidal ideation. (*Id.*) Anderson appeared "calm, cooperative with clear speech and good eye contact." (*Id.*)

On August 10, 2006, at 7:00 a.m., Anderson denied having suicidal or homicidal ideation, visual or auditory hallucinations. (*Id.* at 0353.) He appeared alert and oriented, calm and cooperative, answered appropriately with "with clear speech and good eye contact." (*Id.*) Anderson told the nurse: "The med they gave me last night is too much. I slept all night. I can hardly get up this a.m. my muscles feel weak." (*Id.*) At 8:00 a.m., Anderson was given Zyperxa involuntarily without resistance. (*Id.* at 0352.) At 12:30 p.m. Anderson was seen by me and placed on voluntary medication status, and began taking a lower dose (10 mg.) Zyprexa voluntarily, by tablets. (*Id.* at 0317, 0332, 0352, 0922, 0925.) On August 10, 2006, Anderson ate breakfast, lunch and dinner. At 7:00 p.m., Anderson told the nurse: "I'm O.K. I ate almost all of my food today . . . I think my medications are helping me." (*Id.* at 0352.) The rest of Anderson's stay in MHCB was unremarkable, Anderson denying further suicidal ideation except on August 13, 2006, when the nurse told Anderson he needed to be moved to another unit because of another inmate's admission. Anderson then claimed he was suicidal, and was "not going anywhere" and that "this is a bunch of shit." (*Id.* at 0343.) At discharge on August 14, 2006, Anderson was prescribed 10 mg. Zyprexa for 90 days. (*Id.* at 0309, 0319.) Anderson took Zyprexa voluntarily from August 10, 2006 to August 20, 2006, when Dr. Knight discontinued the prescription at Anderson's request. (*Id.* at 0309, 0319, 0320, 0773.)

26.     Anderson was admitted to MHCB August 30, 2006 to August 31, 2006. (Def.'s Exs. 0413-14.) Anderson reported suicidal ideations. The admitting diagnosis was bipolar disorder. The principal diagnosis was adjustment disorder. (*Id.*)

27.     On admission, Anderson claimed to have suicidal ideation. (Def.'s Exs. 0423-24, 0433.) He appeared anxious and agitated, and had affective instability. (*Id.*) Affective instability is marked shifts or oscillations from a baseline mood to depression, irritability, or anxiety. (*Id.*)

28.     Anderson reported he became "suicidal" as a result of a

transfer to the Substance Abuse Treatment Facility (SATF). (Def.'s Ex. 0424.)  I observed he had "poor eye contact, constricted affect, and appears tense.  Speech is tense; doesn't know why he is prescribed Depakote.  Not responding to internal stimuli.  Non-disclosvie [sic] except to reiterate that he is 'stressed' and 'suicidal.'"  (*Id.*)

29.     On August 30, 2006 at 3:40 p.m. I prescribed Geodon for agitation.  (Def.'s Ex. 0417.)  Anderson refused medication and I ordered involuntary medication of 20 mg. of Geodon.  (*Id.* at 0424.)  I ordered involuntary medication on August 30, 2006, because as a result of a mental disorder, he was an immediate risk of self-harm.  The basis for my opinion was the same for the involuntary medication order two weeks earlier.  In addition, I observed acute agitation, affective instability and diagnosed possible bi-polar disorder. Anderson was only given Geodon once during his August 30-31, 2006, MHCB stay.  (*Id.* at 0417.)

30.     Geodon is used to treat acute agitation associated with schizophrenia or the manic episodes of bipolar disorder.  Like Zyprexa, it works by helping to restore the chemical balance of the brain's neurotransmitters.  An injectable version is available for quick relief of agitated patients.  The usual starting dose is 20-40 milligram twice a day.  For maintenance treatment, the dosage range is usually 40 to 80 milligrams twice a day.  The dose also will depend on certain medical problems the person may have. Here, there was no contraindication for that dosage. Contraindications for its use are dementia or heart conditions which were not present with Anderson.  On the second day of treatment, the dosage may be increased to 60 or 80 milligrams twice a day, if needed. In Anderson's case, it was not needed, because b) the next day he had improved.  (Def.'s Exs. 0424, 0430.)

31.     I prescribed Geodon instead of other medication (such as Zyprexa) because Anderson was experiencing affective instability and not reporting auditory hallucinations.  Geodon was the least restrictive alternative measure to prevent Anderson from harming himself.  The alternative to involuntary medication in Anderson's case, given his condition and the above facts, would be five-point physical restraints, which would not be the least restrictive of the personal liberty of the inmate.

32.     The medication was in the best interest of Anderson, and was immediately for the preservation of life or the prevention of serious bodily harm tp Anderson or others.

33.     On August 31, 2006, Anderson reported that he was improved, and felt like he was ready to leave MHCB.  (Def's Ex. 0424.)  He told me "I want to get back o n my program."  (*Id.*)  He denied suicidal ideations.  (*Id.*)  He was interviewed by

1    psychologist Dr. Kuberski and me and was discharged.  (*Id.* at
     0423-24, 0430.)  No adverse reaction to the medication was noted.
2    (*Id.*)

3  (Doc. No. 51 at 2-9.)

4       In his opposition to Dr. Talisman's motion for summary judgment, Anderson argues that

5  the facts set forth in Dr. Talisman's declaration cannot be considered by this Court because they

6  are based on inadmissible hearsay and are irrelevant.  (Doc. No. 59 at 7.)  He also maintains that

7  because Dr. Talisman stated that, while he has no independent recollection of treating Anderson,

8  his declaration that he would have reviewed portions of Anderson's medical records before

9  ordering the administration of a psychotropic medication is inadmissible as speculation.  These

10  objections to the facts alleged in Dr. Talisman's declaration are unsupported by any citation and

11  are contrary to the Federal Rules of Evidence.

12       Rule 406 of the Federal Rules of Evidence provides that "[e]vidence of the habit of a

13  person or the routine practice of an organization whether corroborate or not and regardless of the

14  presence of eye witnesses, is relevant to prove that the conduct of the person or organization was

15  in conformity with the habit or routine practice."  Thus, Dr. Talisman's testimony regarding the

16  reviewing of his notes, and the contents of Anderson's medical records, is admissible as

17  consistent with his routine practice.

18       The notes made by nurses and other medical staff are admissible pursuant to Rule 803(4)

19  of the Federal Rules of Evidence.  Rule 803(4) provides that

20        The following are not excluded by the hearsay rule, even though
          the declarant is available as a witness:
21
          . . . .
22
          (4)  Statements made for the purposes of medical diagnosis or
23        treatment, and describing medical history, or past or present
          symptoms, pain, or sensations, or the inception, or general
24        character of the cause or external source thereof insofar as
          reasonably pertinent to diagnosis or treatment.
25

26  Further, Anderson's statements may also be considered pursuant to Rule 803(3) of the Federal

Rules of Evidence which provides an exception to the hearsay rule for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . ."  Accordingly, this Court can consider the contents of Anderson's medical records submitted by both parties.

Anderson does not dispute the facts set forth in his medical records prior to August 9, 2006.  In his deposition, Anderson testified that he had been confined in CDCR's Mental Health Care Delivery System ("MHCDS") since 1992.  (Anderson Depo. at 23:4-9.)  He has been in the Correctional Case Management System ("CCMS") and Enhanced Outpatient Program ("EOP") at various times.  (*Id.* at 39:20-40:23.)

Anderson has also been admitted to the Mental Health Crisis Bed Unit ("MHCB") on numerous occasions.  (*Id.* at 42:21-43:18.)  The MHCB is for inmates who suffer from an acute mental health condition requiring twenty-four hour nursing care, such as being a risk to others as a consequence of a serious mental disorder.  (Talisman Decl. ¶ 4.)  Anderson has been diagnosed as having adjustment disorder with psychotic features and bi-polar (manic-depressive) disorder. (*Id.* ¶ 8.)  He has previously been prescribed psychotropic medications.  (Anderson Depo. at 40:24-42:20.)

In his deposition, Anderson admitted that he had attempted to commit suicide twice while in custody.  On one occasion, he had suicidal thoughts and made a noose.  (Anderson Depo. at 23:10-24.)  He also stated that he was placed in the medical crisis unit on August 9, 2006 because he had paranoid thoughts after "[t]hey tried to transfer me . . . and I didn't want to go."  (*Id.* at 35:11-16.)  Anderson stipulated during his deposition that prior to August 9, 2006, he had "suicidal ideations and homicidal ideations."  (*Id.* at 38:9-15.)  He also asserted that he was returned to the crisis unit on August 30, 2006 because he "didn't want to go to that prison. So I had paranoid thoughts.  I thought them officers over there was going to set me up to kill me."  (*Id.* at 35:11-19.)

Anderson testified that he has been confined in the mental health crisis beds for suicidal

1   or homicidal thoughts, or paranoia, on thirty occasions during his imprisonment.  (*Id.* at 43:10-

2   16.)  In mid-July 2006, a few days before the August 9, 2006 incident, Anderson was admitted to

3   the MHCB unit because he stated that he wanted to hang himself.  (Doc. No. 62 ¶ 21.)  Anderson

4   also testified that he had been diagnosed as bipolar and depressed.  (Anderson Depo. 39:1-3.)

5        During his deposition, he stated that on August 9, 2006, and August 30, 2006, prior to

6   being medicated against his will, he was taking loudly to another inmate about doctors force

7   medicating patients.  (*Id.* at 32:14-32:25.)  He did not testify during his deposition that he was

8   talking loudly in his cell on August 9, 2006, "because America wrongfully went to war with Iraq

9   based upon lies," as he declared under penalty of perjury in the complaint he filed on May 15,

10  2007.

11       He also testified that "I've never said to anyone 'I'm going to kill myself.'  Any time I've

12  ever spoken to a clinician or doctor or anyone, I've always said I've had thoughts of doing it.  I

13  never told them I was going to do it."  (*Id.* at 49:13-16.)

14                                          **V**

15                                          **A**

16       Anderson contends that many of the facts set forth in Dr. Talisman's declaration "are

17  irrelevant because Defendant has not provided evidence that he relied on them when he ordered

18  Plaintiff's involuntary medication."  (Doc. No. 59 at 7.)  As discussed above, this argument fails

19  because Dr. Talisman declared under oath in his deposition that he would have reviewed

20  Anderson's medical records in forming his decision whether to order that Anderson be subjected

21  to an injection of a psychotropic medication against his will because he was a danger to himself

22  or others.  Rule 406 of the Federal Rules of Evidence expressly holds that "[e]vidence of the

23  habit of a person . . . is relevant to prove the conduct of the person . . . which is in conformity

24  with the habit or routine practice."

25       Also, as noted above, Anderson's contention that Dr. Talisman's testimony is

26  inadmissible because it is based on the hearsay statements of prison medical staff of Corcoran

-17-

1   prison and is self-serving is incorrect.  (Doc. No. 59 at 8).  The statements in the medical records

2   are admissible under Rule 803(4) "as reasonably pertinent to the diagnosis and treatment."

3   Finally, also as noted above, the statements Anderson made are admissible under Rule 803(3) as

4   statements of Anderson's "then existing state of mind, emotion, sensation, or physical condition

5   (such as intent, plan, motive, design, mental feeling, pain, and bodily health)."

6          The statements in the medical records demonstrate that Anderson suffers from a mental

7   illness that makes him a danger to himself and others because he has had episodes of suicidal

8   and homicidal ideation, suffers from hallucinations, and hears voices which tell him to kill

9   himself.  It is undisputed that, prior to August 8, 2006, Anderson had twice attempted to commit

10  suicide and had been confined in the crisis unit approximately thirty times prior to August 8,

11  2009.  It is also undisputed that during these confinements in the crisis unit, he was prescribed

12  tranquilizing medications to control suicidal or homicidal thoughts.

13         On August 8, 2006, Anderson reported that he was "homicidal because I want to kill

14  those people who want to kill me."  (Deguzman Decl. at 000368.)  The medical records for

15  August 8, 2009 show that Anderson appeared to be "very angry and irritated."  (*Id.* at 000310.)

16         The medical records also show that on August 9, 2006, Anderson was heard shouting in

17  his cell and thereafter refused to take his prescribed medication for his auditory hallucinations.

18  Based on this history of suicidal and homicidal ideations, as well as Anderson's agitated state,

19  Dr. Talisman concluded that Anderson should be involuntarily medicated with Zyprexa.  In Dr.

20  Talisman's medical judgment, "the medication was immediately necessary for the preservation

21  of life or the prevention of serious bodily injury to Anderson or others."  (Talisman Decl. ¶ 22.)

22  Zyprexa treats "acute agitation and certain mental/mood conditions (such as schizophrenia or

23  bipolar mania)."  (*Id.* ¶ 21.)

24         The medical records also show that Anderson was admitted to the MHCB on August 30,

25  2006, because he reported that he was stressed and suicidal as a result of being informed that he

26  was being transferred to another prison institution.  (Deguzman Decl. at 000424.)  He also

-18-

appeared anxious and agitated.  Anderson refused to take medication to control his agitation.

(*Id.*)  Accordingly, Dr. Talisman ordered involuntary medication of 20 milligrams of Geodon

because as the result of Anderson's "acute agitation, affective instability and diagnosed possible

bipolar disorder," he was an "immediate risk of self harm."  (Talisman Decl. ¶ 29.)  "Geodon

provides quick relief of agitated patients."  (*Id.* ¶ 30.)

　　　Anderson maintains that "[t]here are triable issues of fact as to whether Mr. Anderson

posed an imminent threat of harm to himself or others to involuntarily medicate him on August

9, 2006 or August 30, 2006."  (Doc. No. 59 at 1; *see also id.* at 13, 17.)  He argues that Dr.

Talisman failed to identify anyone actually threatened by Anderson.  Anderson also asserts that

there is a material factual dispute as to whether he was capable of harming himself or others

while he was handcuffed in a room with two guards when Dr. Talisman ordered that he be

injected with a psychotropic medication against his will.[2]  Anderson argues that his testimony at

his deposition that on August 9, 2006 and August 30, 2006, that "I was not a threat to myself"

raises a genuine issue of material fact regarding whether an immediate injection of a

psychotropic medication was necessary.  He also argues that Dr. Talisman's deposition

testimony that he was not in the throes of harming himself demonstrates that no emergency

existed on either occasion.  (*Id.* at 13.)  This argument lacks merit.  Anderson fails to cite any

authority, and this Court has  found none, holding that a psychotropic medication can only be

administered against the will of a prisoner who has stated he has suicidal ideation, appears

---

[2]　　　The fact that Anderson was handcuffed and wearing a safety gown does not
demonstrate that he could not seriously harm himself without ingesting a psychotropic
medication.  Dr. Talisman's testimony is undisputed that "inmates, similar in diagnosis and
mental health history, can go from relatively calm to self-injurious behavior in a matter of
minutes if not treated."  (Talisman Decl. ¶ 16.)  Dr. Talisman also testified that inmates can
seriously harm themselves "by bashing their heads on the door, window or wall." (*Id.* ¶ 17.)
This testimony was unrebutted by Anderson in his opposition to the motion for summary
judgment.

agitated, and has refused his medication if that patient poses an immediate threat to himself or others.

As pointed out by the United States Supreme Court in *Harper*, "the extent of a prisoner's right under the [Due Process] Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement" 404 U.S. at 222.  The Court stated:

> Particularly where the patient is mentally disturbed, his own intentions will be difficult to assess and will be changeable in any event.  Respondent's own history of accepting and then refusing drug treatment illustrates the point.  We cannot make the facile assumption approximating those intentions, or a substituted judgment approximating those intentions, can be determined in a single judicial hearing apart from the realities of frequent and ongoing clinical observation by medical professionals.

*Id.* at 231-32.

Here, the undisputed record demonstrates that Anderson is mentally disturbed,  has a history of being placed on twenty-four hour watch because of his self-proclaimed suicidal and has homicidal ideations.  He has twice attempted to commit suicide.  As *Harper* explained, such a history can make his intentions in refusing to accept medication "difficult to assess." *Id.*

At best, Anderson's statement that the facts relied upon by Dr. Talisman were insufficient to demonstrate that there is no genuine issue of material fact in dispute that an involuntary injection of an antipsychotic medication was instantly required, to prevent Anderson from once again attempting to commit suicide, merely reflects a difference of opinion between Anderson and Dr. Talisman regarding the necessity to inject such medication, without an inmate-patient's consent, to prevent him from harming himself.  Anderson has failed to proffer the testimony of a medical expert that Dr. Talisman's medical opinion was erroneous in light of the evidence in Anderson's medical records and his refusal to take his medication after seeking treatment because he had suicidal or homicidal thoughts.  "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

1    claim." *Franklin v. Oregon State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981).

2                                                **VI**

3           The parties agree that on August 9, 2006, and August 30, 2006, Anderson was agitated

4    and shouting in his cell and refused to take his medication after he had sought admission to the

5    crisis unit because he had suicidal and homicidal thoughts.  Dr. Talisman has explained that the

6    benefits of the medication he prescribed included decreased agitation, feeling less anxious,

7    improved concentration, and reduced episodes of hallucinations.  (Talisman Decl. ¶ 21.)  The

8    only factual dispute raised by Anderson in his deposition is whether Dr. Talisman stated that he

9    was going to order that Anderson receive an injection of psychotropic medication so that

10   Anderson would "learn how to keep [his] mouth shut."  (Anderson Depo. 31:7-8.)  Dr. Talisman

11   has stated, however, that he did not order involuntary medication of Anderson for any reason

12   other than due to Anderson's mental disorder, there was an imminent likelihood of serious harm

13   to himself or others.  (Talisman Decl. ¶¶ 22, 32.)  Dr. Talisman also explained that "[i]nmates in

14   the MHCB unit frequently are shouting or yelling and uncooperative.  I do not order involuntary

15   medication for inmates solely because of any of those behaviors.  (*Id.* ¶ 18.)

16          As discussed above, Anderson's claim that he was medicated against his will in

17   retaliation for the exercise of his First Amendment right to freedom of speech has been forfeited

18   because it was not raised in his opposition to the motion for summary judgment.  Although not

19   clearly set forth in his opposition, Anderson also appears to suggest that Dr. Talisman ordered

20   the forcible injection of a psychotic medication solely to punish him for his loud speech.

21          This Court recognizes that in reviewing a motion for summary judgment, a district court

22   must view the facts in the light most favorable to the non-movant.  *Adickes*, 398 U.S. at 457.

23   This Court is also mindful, however, that in reviewing a motion for summary judgment, a district

24   court must consider

25                      [t]he prospect of endless claims of retaliation on the part of
                        inmates would disrupt prison officials in the discharge of their
26                      most basic duties.  Claims of retaliation must therefore be regarded

1    with skepticism, lest the federal courts embroil themselves in
     every disciplinary act that occurs in state prison institutions.
2

3    *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th

4    Cir. 1994)).

5          Here, it is undisputed that at the time Anderson asserts that Dr. Talisman ordered

6    involuntary medication, Anderson had been diagnosed as bi-polar, and suffering from paranoia

7    and hallucinations.  Paranoia is

8                    A mental disorder characterized by extreme, pervasive, and
                     unwarranted distrust of other people's actions and motivation.
9                    Individuals with paranoia assume that others want to deceive,
                     harm, or exploit them, even in the absence of supporting evidence.
10                   . . . They bear grudges and are unwilling to forgive injuries or
                     insults . . . responding instead with extreme hostility.
11

12   *The American Medical Association Complete Medical Encyclopedia* 954 (Random House

13   Reference 1st ed. 2003).  Hallucination is defined as "false perceptions in any of the senses in a

14   person who is awake, but the perceptions are not based on external reality.  Examples include

15   hearing voices of the dead, feeling as if insects are crawling under the skin, or seeing visions of

16   people who are elsewhere."  *Id.* at 625.

17         A district court is required to grant a motion for summary judgment if the evidence is

18   insufficient to find for the non-moving party "by the applicable evidentiary standards" necessary

19   to support a jury's verdict.  *Liberty Lobby*, 477 U.S. at 254-55.  The undisputed evidence shows

20   that Anderson was suffering from delusions at the time of the alleged incidents that, for example,

21   resulted in Anderson hearing voices telling him that prison personnel were trying to kill him.

22   Thus, based on the undisputed evidence of Anderson's medical condition at the time of the

23   incidents alleged in his first amended complaint, this Court is persuaded that no reasonable trier

24   of fact could find by a preponderance of the evidence that his retaliation claim against Dr.

25   Talisman was not the product of Anderson's delusions.

26         In light of Dr. Talisman's knowledge of Anderson's bipolar condition, his episodes of

delusion, prior suicide attempts, thoughts of committing suicide and of killing correctional officers, had Dr. Talisman not ordered that Anderson be tranquilized immediately against his will, he would have faced a § 1983 action by Anderson's estate for willful indifference to his known serious medical needs in violation of the Eighth Amendment if Anderson had committed suicide. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (deliberate indifference occurs when a prison official "knows of and disregards an excessive risk to inmate health or safety"); *Conn v. City of Reno*, --- F.3d ----, No. 07-15572, 2009 WL 2195338, *5 (9th Cir. Jul. 24, 2009) (explaining that for purposes of determining whether deliberate indifference occurred, "[a] heightened suicide risk or an attempted suicide is a serious medical need").

### Conclusion

Because this Court has concluded that Anderson's Fourteenth Amendment rights to substantive and procedural due process were not violated, the defense of qualified immunity need not be addressed.

The undisputed facts of Anderson's lengthy mental illness relied upon by Dr. Talisman, in forming his medical judgment that it was medically necessary to prescribe the injections of medication immediately to prevent Anderson from harming himself or others, in light of the fact that he had refused to take his prescribed medication voluntarily, were not rebutted by the evidence produced by Anderson in his opposition to the motion for summary judgment. Because Anderson has failed to demonstrate that there are genuine issues of material fact in dispute, the Court GRANTS Dr. Talisman's motion for summary judgment. This action is DISMISSED. The clerk is directed to enter judgment and close the case.

/////

DATED: August 5, 2009

/s/ Arthur L. Alarcón
UNITED STATES CIRCUIT JUDGE
Sitting by Designation